UNITED STATES of America, Plaintiff,

v.

BETHLEHEM STEEL CORPORATION, Defendant.

Civ. No. H90–326.

United States District Court,
N.D. Indiana,
Hammond Division.

March 19, 1993.

Richard J. Clarizio, U.S. E.P.A., Office of Regional Counsel, Chicago, IL, Andrew B. Baker, Jr., John F. Hoehner, U.S. Attys. Office, Dyer, IN, Richard B. Stewart, John H. Grady, Kevin P. Holewinski, U.S. Dept. of Justice, Environmental Enforcement Section, Environment and Natural Resources Div., Washington, DC, Deborah A. Kline, Elizabeth A. Ojala, U.S. E.P.A., Washington, DC, Dorothy Attermeyer, Mary Fulghum, U.S. E.P.A., Region V, Catherine J. Garypie, U.S. E.P.A., Office of Regional Counsel, Chicago, IL, Thomas M. Giller, U.S. Dept. of Justice, Environmental Enforcement Section, Chicago, IL, for plaintiff.

Bryan G. Tabler, Donald E. Williams, Mark E. Shere, John M. Kyle, III, Barnes and Thornburg, Indianapolis, IN, J.B. Smith, Beckman Kelly and Smith, Hammond, IN, William H. Graham, Bethlehem Steel Corp., Bethlehem, PA, for defendant.

## MEMORANDUM OPINION AND ORDER

LOZANO, District Judge.

This matter is before the Court on the United States' Motion for Partial Summary Judgment under the United States' First Claim for Relief filed February 7, 1992, the United States' Motion for Partial Summary Judgment Under the United States' Second Through Sixth Claims for Relief, filed on February 18, 1992, The United States' Motion to Strike the Defendant's Citation of Supplemental, Dispositive Authority, filed October 19, 1992, the Defendants' four motions for partial summary judgment on issues regarding Subtitle C of RCRA, and the Defendant's Cross–Motion for Partial Summary Judgment on Corrective Action Issues, both filed on February 18, 1992, and the Defendant's Supplemental Cross–Motion for Partial Summary Judgment on Corrective Action Issues, filed April 14, 1992. For the reasons set forth below, this Court hereby **GRANTS** the United States' Motions and **DENIES** the Defendant's Motions.

BACKGROUND

In this case, the Plaintiff, the United States ("the United States") alleges that a series of environmental violations have occurred and continue to occur at the Defendant, Bethlehem Steel Corporation's (the "Defendant"), integrated steelmaking facility located in Burns Harbor, Indiana. The United States asserts six claims for relief in its Complaint based upon two federal environmental statutes. In its first claim for relief, the United States alleges that the Defendant violated the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, and the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f *et seq.*, by failing to perform the corrective action program required by two Underground Injection Control ("UIC") permits that the Environmental Protection Agency (the "EPA") issued to the

Defendant. The United States alleges in its remaining five claims that the Defendant violated numerous RCRA requirements in its operation and management of three hazardous waste management units at its Burns Harbor facility, i.e., a landfill and two terminal polishing lagoons ("the lagoons"). The United States seeks both injunctive relief and civil penalties for each of its six claims.

DISCUSSION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *First Wis. Trust Co. v. Schroud*, 916 F.2d 394, 398 (7th Cir.1990). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir.1991); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court must read all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Richardson v. Penfold*, 839 F.2d 392, 394 (7th Cir.1988).

The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might effect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fior-*

*enzo,* 840 F.2d 427, 434 (7th Cir.1988) (citing *Anderson,* 477 U.S. at 250–252, 106 S.Ct. at 2511–2512).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir. 1988). Therefore, if a party fails to establish the existence of an essential element of its case on which it bears the burden of proof at trial, summary judgment will be appropriate. In this situation, there can be " 'no genuine issue as to any material fact', since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (1986).

*The United States' First Claim for Relief*

The United States' first claim is brought under RCRA and SDWA and is based on the Defendant's alleged failure to comply with the terms of two UIC permits that the EPA issued to the Defendant on September 30, 1985. These UIC permits allow Defendant to dispose of hazardous waste ammonia liquor into two deep injection wells at its Burns Harbor Facility (the "Facility"). Among other things, these permits required the Defendant to perform a phased program of corrective action at its Facility. The first phase, Preliminary Assessment, was required to be completed within 39 days of the issuance of the permits, but no later than 45 days after the effective date of the permit—January 19, 1989. The second phase, Corrective Action, required the Defendant to submit to the EPA a corrective action plan to remediate any releases of hazardous constituents within six months of the effective date of the permit. The third phase, Correction Action Implementation, required the Defendant to implement a corrective action plan within 36 months of the effective date of the permit.

The United States alleges it is entitled to injunctive relief and civil penalties under its first claim for relief because the Defendant violated RCRA and SDWA by failing to comply with the corrective action program in accordance with the schedule of its UIC permits. First, the Defendant did not complete the Preliminary Assessment Phase as it was required to within 39 days of the issuance of the permits or at least no later than 45 days after the effective date of the permit—January 19, 1989. Second, the Defendant did not submit to the EPA a corrective action plan to remediate any releases of hazardous constituents, within six months of the effective date of the permit, as it was required to do under the second phase.

■ The Defendant presents several defenses to the United States' first claim. In its Cross–Motion for Partial Summary Judgment, the Defendant first argues that the 1989 versions of the UIC permits have been superseded by modified permits that were issued to the Defendant in 1990. *See* Underground Injection Control Permits IN–127–1W–0003 and –0004, Defendant's Exh. Nos. 66 and 67 (the "1990 permits"). The 1990 permits were accompanied by a one page order, signed and dated by the director of the EPA's Water Division, and stated, "this modified permit shall become effective on October 13, 1990, *and shall supersede the existing permit upon issuance."* Defendant contends that the legal effect of a superseding permit means to set aside, annul, displace, make void, or otherwise repeal a prior permit, citing *Health–Chem Corp. v. Baker,* 915 F.2d 805, 811 (2nd Cir.1990), Black's Law Dictionary (5th Ed.1979), and several other cases. The Defendant also disputes the United States' reliance on the following regulation:

In a permit modification under this section, only those conditions to be modified shall be reopened when a new *draft* permit is prepared. All other aspects of the existing permit shall remain in effect for the duration of the *unmodified* permit. When a permit is revoked and reissued under this section, the entire permit is reopened just as if the permit had expired and was being reissued. During any revocation and reissuance proceeding the permittee shall comply with all conditions of the existing permit until a new final permit is reissued.

40 C.F.R. § 124.5(c)(2) (1991) (emphasis added). Under the above regulation, the effect of the draft permits is to immediately suspend "those conditions to be modified" from the prior 1989 permits. The regulation also states that all other aspects of an existing permit remain in effect for the duration of the unmodified permit. The Defendant claims that the duration of the 1989 unmodified permits ran only until the permits were superseded by the issuance of a final modified permit.

As to Defendant's first defense, this Court finds that it is not only illogical, but it is not consistent with government regulations. The permit modifications did not modify the corrective action schedule or requirements or change the general expiration date of the UIC permit: October 30, 1990. Moreover, the word "modified" indicates a change in an already existing document. Black's Law Dictionary defines "modify" as "to alter; to change in incidental or subordinate feature; enlarge, extend; amend; limit, reduce." (6th Ed.1990). Webster's Third New International Dictionary defines "modify" as "to make minor changes in the form or structure of: alter without transforming"; and defines "modification" as "the act or action of changing something without fundamentally altering it." (Unabridged Ed.1971). Thus, it clear that the word "modify" means a change in an existing document without affecting the legal effect of the prior document. The Defendant's construction of the word "modify" also makes no legal sense. Subparagraph (a) of 40 C.F.R. § 124.5 specifies the three alterations which may be made to existing permits: (a) modification; (b) revocation and reissuance; and (c) termination. Such actions may be taken only for the causes specified in §§ 144.39 and 144.40 for UIC permits. Subparagraph (c)(2) explains the distinction between modification, revocation, and reissuance of a permit. The modification involves "reopening" only those conditions to be modified; and "revocation" and "reissuance" involves "reopening" the entire permit "just as if the permit had expired and was being reissued." Moreover, for a permit to be reissued under this provision, a new permit application must be submitted. 40 C.F.R. § 124.5(c)(1). Lastly, the fact that

the UIC permits may have allegedly expired has no legal significance to the Defendant's liability. The EPA's regulations provide that "the conditions of an expired permit continue in force ... until the effective date of a new permit" if: (1) permittee has submitted a timely and complete permit application, and (2) the EPA through no fault of the permittee, has not issued a new permit. 40 C.F.R. § 144.37(a). The Defendant has submitted a timely application, however, the EPA has not yet issued or denied a new permit to the Defendant. Accordingly, such continued permits "remain fully effective and enforceable." 40 C.F.R. § 144.37(b).

■ The Defendant's second defense to the Government's enforcement action is that attachment F to the 1989 permits, which requires preliminary assessment and corrective action, is a boilerplate form that violates the EPA's current policies and that the EPA should have known that the limited time period set forth in the attachment for compliance were impossible for the Defendant to comply with. The EPA's policy is that the corrective action requirements in a permit must be developed on the basis of site-specific characteristics of the facility at issue:

> [I]t is necessary to stress the importance of site-specific technical detail in the development of ... corrective action permit requirements. Each facility has unique characteristics and circumstances affecting it that need to be incorporated into any requirements for corrective action.

> [T]he agency should also propose a site-specific time-frame for completion of the [corrective action] work. Enforcement of permit conditions or request for relief in an order is always easier when very specific detail is included. Without a detailed schedule of compliance in a permit or a compliance schedule in a Corrective Action Order, we can expect untimeliness in submittals and actions.

(Oswer Directive No. 9902 Interim Final RCRA Corrective Action Plan, Defendant's Exh. 52 at 3).

Defendant argues that the only issue in this case is the 45 day time frame provided in the 1989 permits for the Defendant to submit

its preliminary assessment reports. The Defendant complains that when it finally completed its preliminary assessment in 1990, the "reports make a stack of material about 4 feet high." The Defendant's argument can be summarized as follows: It was unreasonable of the EPA to expect the Defendant to comply with the permit deadlines for compliance on a timely basis.

However, as the United States correctly points out, this is not a defense to an enforcement action. The Defendant never attempted compliance prior to receiving the United States' Notice of Violation in April 1990. Further, the Defendant never sought relief from the Corrective Action Schedule imposed by its UIC permits. In fact, the Defendant has a long history of inaction. On November 8, 1984, when Congress amended RCRA to ensure that all RCRA permits would require corrective action measures, the Defendant knew that the EPA would impose corrective actions requirements in the Defendant's permits. It chose to do nothing. When the permits were issued in draft form in July 1985, they contained the corrective action conditions. The Defendant objected to the imposition of the conditions, but did not object to the time frame for compliance. Moreover, it offered the EPA no alternative schedule for compliance by way of a comment. When the 1989 permits were issued in September 1985, the permits continued to impose corrective action requirements, but still Defendant took no steps to begin compliance. Instead of taking steps to comply with the permits, the Defendant appealed the permit conditions to the EPA, which rejected the Defendant's arguments on January 19, 1989. The Defendant then appealed the EPA's decision to the Seventh Circuit Court of Appeals, which again rejected the Defendant's claims and upheld the validity of the permits, including the corrective action requirements. *Inland Steel Co. v. EPA,* 901 F.2d 1419 (7th Cir.1990). During the course of the appeal, the Defendant requested a stay of the applicability of the permits pending judicial review, but the Court denied the Defendant's motion. Finally, after April 19, 1990, when the EPA sent the Notice of Noncompliance to the Defendant, the Defendant requested a meeting with the agency to discuss compliance. After vigorously contesting its compliance with the permits, Defendant now first complains that the time frame to comply with the conditions of the permits is too short. The Defendant gives new meaning to the word "laches". It appears that had Defendant complained earlier about the restrictive time schedule, the EPA and the Defendant could have modified the time schedule to assure compliance by the Defendant. Lastly, the Defendant's "impossibility defense" is no defense to this type of action brought under RCRA. *United States v. T & S Brass and Bronze Works, Inc.,* 681 F.Supp. 314 (D.S.C.1988), *aff'd,* 865 F.2d 1261 (4th Cir.1988).

### The United States' Second Through Sixth Claims for Relief

Instead of addressing whether the United States is entitled to relief on these claims, the Court will consider the Defendant's several defenses, which are the subject of the Defendant's Motions. Whether the United States is entitled to relief is determined at the conclusion of this Order in its findings of fact and conclusions of law.

### Temporary Exclusion Defense

■ The United States claims that Subtitle (C) of RCRA applies to the material in a landfill and the sediment in the lagoons at the Defendant's Facility. The Defendant argues that it is entitled to partial summary judgment on these claims because all the material and sediment at issue was the subject of a temporary exclusion, that bars the application of Subtitle (C) today. The Defendant avers that the United States disputes only the presence of the material and sediment disposed in the landfill and lagoons during a twenty-four month window that ran from November 1980 to November 1982. Without this window, the Defendant claims that the United States has no claim to Subtitle (C) regulation.

In November 1980, the regulations for Subtitle (C) became effective. The Defendant received a temporary exclusion for material disposed after November 22, 1982. The Defendant vigorously argues that when it applied for a temporary delisting of the hazardous materials or waste that it was

placing in the landfill and lagoons, included within its petition was the delisting of the material generated from November 1980 to November 22, 1982. Apparently, Defendant is assuming that since the material from 1982 on is excluded from Subtitle (C) of RCRA and the material from 1980 to November 1982 was part of the delisting petition, everything in the landfill and lagoons is not subject to subtitle (C) of RCRA.

The Government is completely at odds with the Defendant's position for several reasons. First, the Government argues that all of the Defendant's waste placed into the landfill and lagoons are subject to RCRA requirements whether they were disposed of before November 22, 1982, or after that date. The Government claims that the Defendant's temporary exclusion granted on November 22, 1982, was withdrawn as a matter of law on November 8, 1986. Temporary exclusions are interim delisting actions which temporarily exclude a listed waste from regulation as hazardous, but are not a final delisting action. In 1984, Congress, concerned that too many temporary decisions to delist were made without going through the necessary procedures to make them final, modified the delisting procedures in the Hazardous and Solid Waste Amendments ("HSWA"). HSWA amended RCRA to expressly provide that such temporary exclusions would cease to be in effect unless a final decision to grant or deny was promulgated by November 8, 1986. See 42 U.S.C. § 6921(f)(2)(B). The EPA did not promulgate a final decision on the Defendant's delisting petition by such time. Accordingly, the effect of this deadline without the EPA action was a withdrawal of the Defendant's temporary exclusion and the reinstatement of its obligation to manage its waste subject to Subtitle (C) of RCRA. Thus, once a temporary exclusion is no longer in effect, the waste must be managed as hazardous. See McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317, 1324 (D.C.Cir.1988). Moreover, the United States disputes that it has formally admitted that the waste disposed of after November 22, 1982 through November 8, 1986, is not subject to regulation as it is contrary to case law and agency positions. The United States also argues that the Defendant's position de-

fies common sense, as the Defendant's exclusion was only temporary, not a final agency action, and thus once withdrawn could not have the effect of permanently exempted the waste from being treated as hazardous.

Based on the above, this Court finds that it is immaterial whether a window from 1980 to 1982 existed, as the Defendant's temporary exclusion expired by operation of law on November 8, 1986. See 42 U.S.C. § 6921(f)(2)(B). Moreover, based on the statute that provided such temporary exclusions would cease to be in effect unless a final decision to grant or deny was promulgated by November 8, 1986, there is no legitimate argument that can be advanced that the exclusion was anything but "temporary" as opposed to a permanent agency decision to exclude a listed waste from regulation as hazardous. Further, although the Defendant vehemently disputes this conclusion, it has consistently been the EPA's position that once the temporary exclusion time period had passed, all of the materials in the lagoons and landfill were subject to Title C of RCRA if the material within the lagoons or landfill was not otherwise disposed of properly. See Dep. of Joseph M. Boyle, Chief of RCRA Enforcement Branch, EPA Region 5, United States' Exh. 15 at 112–113 and 117–118; Memorandum of Marcia Williams, Director of the Office of Solid Waste of the EPA, dated July 31, 1987, Defendant's Exh. 60 at 3–4.

*Shell Oil Co. v. EPA Defense*

The Defendant claims that the United States cannot prevail in Claims 2 through 6 of its Complaint because the materials in the landfill and the lagoons that are disposed of by the Defendant are not hazardous and that the recent decision in *Shell Oil Co. v. EPA* also bars the United States' claim. From the mid–1960's to June 16, 1983, the Defendant conducted electroplating operations at the Facility. During that time period, the Defendant treated the wastewater from its electroplating operations by, among other things, adding a flocculent or thickener. One of the purposes of this flocculent or thickener was to promote the settling of solids that formed during the treatment of wastewater. The Defendant combined wastewaters from its

electroplating operations with wastewaters from other industrial operations at the facility. The wastewater was treated in the Defendant's Secondary Wastewater Treatment Plant. The wastewater was chemically treated to produce a thickened "sludge" and wastewater which needed to be either further treated or have its temperature modified. The remaining wastewaters were sent to the facility's two terminal polishing lagoons for this further treatment, and after receiving the final treatment, the plant wastewater was discharged into the Little Calumet River. The sludge was passed through vacuum filters to reduce the water content to produce filtercake, which was then placed in a landfill, which is one of the subjects of this case. Less than 1% of the wastewater that the Defendant treated in its treatment plant came from electroplating.

Under the regulations that implement RCRA, material can be hazardous in two ways. First the material can show one of four hazardous characteristics—it may be toxic, ignitable, corrosive, or chemical reactive. *See* 40 C.F.R. § 261.20–24 (1991). Another way a material can be hazardous is if it is included in a listing of wastes that are deemed hazardous. *See* 40 C.F.R. § 261.31 (1991). Defendant claims that the mixture of a nonhazardous waste with a listed material should not be hazardous. The Defendant reaches this conclusion based upon the holding in *Shell Oil Co. v. EPA,* 950 F.2d 741 (D.C.Cir.1991). In *Shell Oil,* various organizations challenge the EPA's promulgation of "the mixture rule", which required that waste be treated as hazardous if "[i]t is a mixture of solid waste and one or more hazardous wastes listed in Subpart D and has not been excluded from this paragraph under §§ 260.20 and 260.22 of this Chapter." *Id.* at 749. *See* 45 Fed.Reg. 33,119 (40 C.F.R. § 261.3(a)(2)(ii)).

The Plaintiffs in *Shell Oil* argued that the EPA failed to provide adequate notice and opportunity for comment when it promulgated the mixture and derived-from rules. *Shell Oil,* 950 F.2d at 746. The D.C. Circuit

Court of Appeals held that "[b]ecause the EPA has not provided adequate notice and opportunity for comment, we conclude that the mixture and derived-from rules must be set aside and remanded to the EPA." *Id.* at 752. At issue in this case is not the mixture rule, but whether under RCRA regulations, the sludge from the Defendant's electroplating operations is "listed" as a hazardous waste. This is the United States' argument, and "[a]n agency's interpretation of its own regulation will be accepted unless it is plainly wrong." *Chemical Waste Management, Inc. v. EPA,* 869 F.2d 1526, 1538–39 (D.C.Cir. 1989). On a highly technical question, this Court must show "considerable deference to an agency's expertise." *Id.* at 1539. Moreover, this Court finds the Defendant's position untenable because "[i]f wastes could become nonhazardous simply by being mixed with other wastes, there would be a tremendous incentive simply to dilute hazardous wastes to avoid regulation. Potentially large quantities of hazardous waste could escape regulation." *See* Jeffrey M. Gaba, *The Mixture and Derived From Rules Under RCRA: Once a Hazardous Waste Always a Hazardous Waste?,* 21 E.L.R. 10033 (1991).

Pursuant to 42 U.S.C. § 6921, the EPA has listed as a hazardous waste, "wastewater treatment sludges [1] from electroplating operations" and has assigned this as Waste No. F006. 40 C.F.R. § 261.31 (1991). Even if the term "wastewater treatment sludges from electroplating operations" is unclear, the Background Document to the listing contemplated that wastewaters from electroplating operations would be mixed with wastewaters of other industrial operations. The preamble to the EPA's regulations that list F006, states that "[d]etailed justification for listing each hazardous waste ... is contained in specific [B]ackground [D]ocuments." 45 Fed.Reg. 33113 (1980). The Background Document provides:

> The electroplating industry consists of both job shops and captive platers. Job shops are small, independent operations performing electroplating on a contract basis while captive facilities are part of an

---

1. Under the regulations, sludge is defined as: "any solid, semi-solid, or liquid waste generated from a municipal, commercial, or industrial wa-

ter treatment plant ... exclusive of the treated effluent from a wastewater treatment plant." 40 C.F.R. § 260.10 (1991).

integrated manufacturing firm (i.e. electroplating operations carried-out in an automobile manufacturing facility, aircraft manufacturing facility, etc.) Of the approximately 10,000 electroplating facilities in the United States, it is estimated 3,000 are job shops and 6,000 are captive shops . . .

(Exh. 19 at 106–07, United States' Opposition to Def. Motions for Partial Summary Judgment). The term "integrated facility" is not defined by RCRA, but the Clean Water Act regulations, promulgated near the same time the EPA promulgated the F006 listing, defined it as "a facility that performs electroplating operations as only one of several operations necessary for manufacture of a product at a single physical location and has significant quantities of process wastewater from non-electroplating operations." 40 C.F.R. 413.02(h) (1991). The Defendant admits it is an integrated facility. *See* Defendant's Exh. 39 at 4 and Figure 1. The Background Document to this listing thus makes it clear that where sludge has been generated at an integrated facility from the combined treatment of wastewaters from electroplating operations and those of other industrial operations, the resulting sludge meets the F006 listing. Further, in the Background Documents "Response to Comments" section, which discusses chemical conversion coating, an electroplating process, and whether it should be included in the F006 listing, the Agency stated:

it should be pointed out that conversion coating processes are usually associated with electroplating operations and, thus, wastes from conversion coating operations are most likely to be *combined* with those of other metal finishing operations of similar waste characteristics and treated in a single treatment plant. Therefore, the Agency will continue to include the general category of chemical conversion coating operations in the electroplating category, so that these process sludges will continue to be listed as hazardous waste.

(United States' Exh. 19 at 140–141). This interpretation by the Agency has been consistent over time, is entitled to substantial deference by the Court, and is supported by one of the Defendant's exhibits. *See American Mining Congress v. EPA*, 824 F.2d 1177, 1182 (D.C.Cir.1987); Defendant's Exh. 31. When announcing treatment standards for F006 and responding to a comment about that rule-making, the EPA described the treatment of wastewaters from electroplating operators and stated the following:

The concentrations and identities in these wastewaters can vary depending on the specific metals used in the plating process. In addition, other wastewaters are often generated at electroplating operations from sump collections of floor rinsings, from accidental spills and from general maintenance. While these wastewaters may be potentially recovered by mixing with other process waters . . . the sludge generated from these processes would also be classified as F006.

*See* Defendant's Exh. 31, 53 Fed.Reg. at 31153 (1988). Moreover, the Defendant's argument ignores the plain language of the F006 listing. The term "wastewater treatment sludges from electroplating operations" does not have the word "solely", "only", or "exclusively" in it, to imply that only wastewater treatment sludges from electroplating operations and not a mixture thereof is hazardous waste. Where words have not been included in a particular statute or regulation, it is not this Court's role to add them. *See United States v. Monia*, 317 U.S. 424, 430, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1942). The inclusion of the word "treatment" after "wastewater" suggests that the sludges subject to the listing would result from any treatment process or activity employed by a particular facility, including a treatment system that simultaneously treats wastewaters from various industrial operations. Under RCRA, the word "treatment" is defined to mean:

any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or a composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous . . . or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical com-

position of hazardous waste so as to render it nonhazardous.

42 U.S.C. § 6903(34).

After considering the parties' arguments, this Court cannot say that the United States' interpretation of their own regulation is patently wrong, but seems reasonable under the circumstances. The EPA has long had the policy that once wastes are listed as hazardous, they are presumed to remain hazardous. In fact, one court has stated that the EPA has consistently adhered to the general rule that "a hazardous waste does not lose its hazardous character simply because it changes form or is combined with other substances." *Chemical Waste Management*, 869 F.2d at 1539. *See also* 45 Fed.Reg. 33,095–96 (1980). The mixture rule was derived from this general principle.

■ Lastly, to the extent that the Defendant challenges the absence of what it claims is a "uniformity of risk" or "uniformity of hazard" in the F006 listing, it is clear that this Court is without jurisdiction to challenge a regulation in this enforcement proceeding. *See* 42 U.S.C. § 6976; *United States v. Ethyl Corp.*, 761 F.2d 1153, 1157 (5th Cir.1985), *cert. denied sub nom. Firestone Tire & Rubber Co. v. United States*, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986); *Waste Management of Illinois, Inc. v. EPA*, 714 F.Supp. 340, 346 (N.D.Ill.1989). This involves the attacking of the validity of an agency regulation which this Court cannot do, as opposed to attacking a particular interpretation or application of that regulation, which the Court may do. *See Waste Management*, 714 F.Supp. at 346. Thus, the Defendant's "de minimous" argument based on the fact that the Defendant's F006 comes from 99.9% nonhazardous sources, less than 1% from a listed hazardous source, and has no hazardous characteristics, is without merit.

*Defense Based on the Regulatory Definition of "Sludge"*

■ In this Motion, the Defendant argues that the F006 in the terminal polishing lagoons is not "sludge" under RCRA and thus it is exempt from RCRA's regulations. As stated earlier, sludge is defined as "any solid, semi-solid, or liquid waste generated from municipal, commercial, or industrial wastewater treatment plant ... exclusive of the treated effluent from a wastewater treatment plant." 40 C.F.R. § 260.10 (1991). The Defendant claims the material in the lagoons is not sludge because it was not generated from the Defendant's treatment plant, but was generated in the lagoons themselves from the settling of particles within the lagoons. Defendant claims that essentially clean water is carried into the lagoons with only a trace of F006 present. Defendant argues that the Government has not produced any direct evidence that this settling has ever occurred or that any kind of tracing is possible to the Defendant's electroplating operations. However, as the United States points out, in the Defendant's Petition for Temporary and Permanent Exclusion dated July 14, 1981, the Defendant stated that "[v]arying amounts (up to 10,000 tons per year) of [terminal polishing lagoon] dredgings are generated during intermittent maintenance of the plant's terminal polishing lagoons, as well as the lagoon influent and effluent channels." (Defendant's Exh. No. 39). In the same report, a diagram of the Defendant's wastewater treatment facilities stated that the terminal polishing lagoon dredgings amounted to 8,000 tons in 1979, which were disposed of in the landfill. *See Id.*, Figure 1. Most importantly, this diagram shows that spent electroplating solutions inevitably end up in the Defendant's lagoons.

The Defendant also argues that the material in the polishing lagoons cannot be sludge because it is not generated from an industrial wastewater treatment plant, that is, the polishing lagoons are not part of an industrial wastewater treatment plant. The Defendant's argument is attractive on its surface. However, this Court must find that the Defendant's polishing lagoons are part of a wastewater treatment operation. In fact, the Defendant has admitted such on numerous occasions. *See* United States' Exh. No. 9, January 11, 1979, diagram submitted in support of the Defendant's Indiana NPDES permit application, labeling the stream entering the lagoons as "untreated process wastewater and partially treated process wastewa-

ter," and the stream leaving lagoons as "potable water, industrial service water, storm drainage, dewatering well water, non-contact cooling water and treated process wastewater"; Exh. 15, United States' Opposition to. Defendant's Motions, April 8, 1992, Memo from Sapia to Leming, p. 2 and Figure 1; Exh. 2, United States' Second Summary Judgment Motion, Boltz Dep. at 60–61, indicating that the lagoons are an operative part of the Burns Harbor facility's secondary wastewater treatment system. Moreover, the RCRA definition of "treatment" supports the United States' position that the lagoons constituted an important part of the Defendant's wastewater treatment plant. The regulations define "treatment" as

> Any method, technique, or process, including neutralization, *designed to change the physical, chemical, or biological character or composition of any hazardous waste* so as to neutralize such waste, or so as to recover energy or material resources from the waste, or so as to render such non-hazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amendable for storage, or reduced in volume.

40 C.F.R. § 260.10 (emphasis added). This definition encompasses what occurred at the Defendant's lagoons. In October 1970, the State of Indiana Health Commissioner wrote to the Defendant, and described the lagoons as they were proposed by the Defendant to the State Board of Health. The letter stated that "[the lagoons are to be used as] settling and oil skimming basins ... [which] will provide 19 hours of detention time." (Exh. 10, United States' Opposition to Defendant's Motions for Partial Summary Judgment, letter dated October 21, 1970, at 1.) The temperature monitoring equipment at the proposed lagoons was "to control the use of the lagoon[s] for cooling." Thus, the letter

shows that the lagoons were "designed to change the physical, chemical, or biological character or composition of any hazardous waste," within the meaning of 40 C.F.R. § 260.10, and therefore are part of the facility's wastewater treatment plant.[2]

Next, the Defendant argues that the lagoons cannot contain F006 because the only material that is sent to the lagoons was clean "treated effluent". The EPA has stated that the F006 listing does not include the "treated effluent decanted from the electroplating treatment process." (46 Fed.Reg. 61276 n. 10 (1981), Defendant's Exh. 30). Defendants also point to an internal draft of an EPA memo which stated: "Based upon comments from members of the electroplating industry ... it appears that the regulated community interpreted the listing to only include sludges that formed during the treatment of the wastewaters and not sludges that may form after the effluent leaves the wastewater treatment facility." (Draft Memorandum from Marcia E. Williams, EPA, Director Office of Solid Waste at 1, Defendant's Exh. 50 (1985)) However, as noted by the United States, this draft memorandum should not be given the force of law, as the memorandum does not even represent agency policy on this issue. Cf. *Community Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C.Cir.1987) (policy statement has no binding effect on agency). Further, this Court finds that this memo is not particularly damaging because it is true that listed wastes include "sludges formed during the treatment of wastewaters, not sludges that may form after the effluent leaves the wastewater treatment facility." Because the lagoons at issue were part of the wastewater treatment plant, the sludges which settle at the bottom of the lagoons are F006 listed waste.

Along the same lines, as this Court finds that the wastewater in the lagoons was treat-

---

**2.** Further, the case of *In re Brown Wood Preserving Co.*, RCRA (3008) Appeal No. 86–4, Defendant's Exh. 37, supports the United States' position that the Defendant's polishing lagoons were part of a wastewater treatment plant. *Brown Wood Preserving* defined "plant" as a term used in the RCRA definition of "sludge" to include a holding pond downstream from a filter system: "the word 'plant' denotes an entire facility, a *collection* of units, machines, land, buildings,

and fixtures used in a trade or a business, not a single intermediate unit in the treatment process. (citation omitted)" *Brown Wood Preserving* at 18. The Defendant also makes an argument that the material in the lagoons cannot be F006, but for the reasons stated in this Court's determination of the Defendant's Second Partial Motion for Summary Judgment, this argument is without merit.

ed, it is clear that the wastewater can only be considered "treated effluent" after it went through final treatment. The term "treated effluent" is not defined in RCRA. However, it is helpful to look at the exclusionary portion of the RCRA term "solid waste" and the use of the term "effluent" under the Clean Water Act, 33 U.S.C. § 1251, *et seq.* RCRA excludes from the definition of solid waste "[i]ndustrial wastewater discharges that are point source discharges subject to regulation under Section 402 of the Clean Water Act." 40 C.F.R. § 261.4(a)(2). *Cf. Lutz v. Chromotex, Inc.,* 725 F.Supp. 258, 263 (N.D.Pa.1989). The Defendant has admitted that the relevant "point source" at the Burns Harbor facility, pursuant to § 402 of the Clean Water Act, is *after the lagoons, at outfall 001. See* Exh. 5, Sapia Dep. at 78; Exh. 2(b) (fig. 1), United States' Second Motion for Summary Judgment. Accordingly, the wastewater being treated is solid waste until it is discharged through outfall 001. The purpose of this exclusionary language is to avoid duplicative and possibly contradictory regulation by the Clean Water Act and RCRA. In addition, under the Clean Water Act, "effluent" refers to a discharge from a "point source" into "waters of the United States". 40 C.F.R. § 122.2 (1991). As previously explained, the wastewater which entered the lagoons was not discharged from the point source. Rather, the lagoons provided further treatment. Thus, given the CWA's description of "effluent", the wastewater in question became "treated effluent" at outfall point 001, and not upstream in the lagoons.

*Defense Based on the Statutory Definition of Hazardous Waste*

■ The Defendant claims that the statutory definition of "hazardous waste" extends only to material that poses some real world risk. Under RCRA, a material is legally hazardous only if it may:

(a) cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(b) pose a substantial present or potential hazard to human health or to the environment when improperly treated, stored,

transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5) (1983). The Defendant claims that neither the polishing lagoon nor the landfills pose any real world risk because the water in the lagoons meets drinking water standards are the Safe Drinking Water Act. *See* 40 C.F.R. § 141.11 (1991). Defendant argues that this Court must focus on the water in the landfill and the lagoons, as opposed to the sediment in either, because the potential risk present is that the material will contaminate the water table. The argument goes that since the water in the lagoons and landfills is safe under the Safe Drinking Water Act, then the materials must not be hazardous under RCRA.

In effect, the Defendant invites this Court to disregard or legislate what is "hazardous" under the RCRA. This Court declines to accept the Defendant's sweeping invitation. Pursuant to 42 U.S.C. § 6921(a), Congress has delegated to the EPA rulemaking authority to decide which substances constitute "hazardous waste" within the meaning of 42 U.S.C. § 6903(5). The EPA acting pursuant to this authority granted to it by Congress, has determined, following public notice and comment, that wastewater treatment sludges generated from electroplating operations such as those conducted by the Defendant, meet the definition of a hazardous waste when it listed F006 as a hazardous waste. This Court has absolutely no authority to determine what shall be deemed "hazardous" under RCRA, nor does it claim to have any expertise of what may be environmentally hazardous. As discussed, the Defendant has admitted that it generated "wastewater treatment sludges from electroplating operations". The time for the Defendant to object has long since passed, and this Court has no jurisdiction to determine the legality of an EPA regulation. *See* 42 U.S.C. § 6976. Moreover, Defendant has not obtained a final exclusion pursuant to RCRA delisting procedures and the Defendant's F006 waste remains hazardous until Defendant obtains same. *See* 40 C.F.R. § 260.22; *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1319 (D.C.Cir.1988).

*Equitable Estoppel Defense*

■ The Defendant claims that the United States should be estopped from bringing this action because the United States has failed to make a final determination on the Defendant's delisting petition, which has been pending with the agency since July 14, 1981. By law, "[t]o the maximum extent practicable, the Administrator shall ... grant or deny such a petition within twenty-four months after receiving a complete application." 42 U.S.C. § 6921(f)(2)(A) (1992). "The affirmative defense of equitable estoppel is not applicable against the government in the same manner as against a private party." *United States v. Lair*, 854 F.2d 233, 237 (7th Cir.1988) (quoting *United State v. Bob Stofer Oldsmobile–Cadillac, Inc.*, 766 F.2d 1147, 1151 (7th Cir.1985)). In cases involving the United States, estoppel is applicable only if the Government's actions constitute "affirmative misconduct" and if four additional requirements are satisfied.[3] *Id.* at 237–238. Defendant first claims that the EPA's affirmative misconduct is shown in its decade-long delay on Defendant's petition. On November 2, 1986, the EPA denied Defendant's delisting petition. In 1988, the DC Circuit Court of Appeals held that the EPA violated the Administrative Procedure Act when it promulgated its "vertical and horizontal spread" model/policy which predicts the "leachate" levels of the hazardous components of certain wastes. *McLouth*, 838 F.2d at 1319, 1323. In light of the *McLouth* decision, Defendant moved that its petition be remanded to the agency on March 18, 1988, and on July 29, 1988, the DC Circuit granted the Defendant's motion. On September 30, 1988, the EPA withdrew its denial of Defendant's petition. At this time, the EPA informed the Defendant that it had to continue to treat its F006 waste as hazardous until such time as it was granted an exclusion by the agency. On September 19, 1990, the EPA again proposed that the Defendant's delisting petition be denied.

Based on these facts, this Court cannot find that the EPA committed affirmative misconduct by failing to rule on the Defendant's petition. It is clear that since 1981 the EPA has taken final action on the Defendant's petition, however, the *McLouth* decision required the EPA to revisit the Defendant's petition as well as the VHS model. Although the EPA has a duty to grant or deny a petition within twenty-four months after receiving a complete application, this must be done "to the maximum extent practicable." Although there has been no evidence from the United States that it was not practicable to decide the Defendant's petition within twenty-four months, this Court cannot find that this delay was unreasonable or affirmative misconduct on the part of the EPA. Although the statute is mandatory, some discretion lies therein based on its wording.

The Defendant also argues that the lawyers engaged in prosecuting this action may have contributed to this delay or have otherwise interfered with action on the Defendant's petition. Two lawyers for the EPA contacted the EPA's contractor for work on Bethlehem's petition, and in a letter "express[ed]" concern because they now know that the proposed denial comments are being addressed and preparation of the final decision is moving along." (Defendant's Supp. Exh. 94). They claim that the lawyers tried to influence the substantive decision of the delisting office because the two lawyers stated that they "want to make sure that all the regulating authorities are saying the same thing."

This is insufficient evidence to support the assertion that the EPA has improperly tried to interfere with the delisting process to ensure that the EPA's action against the Defendant may be prosecuted. Moreover, the EPA has provided an affidavit of Robert H. Kayser, Chief of the Delisting Section, who stated that to the best of his knowledge no enforcement lawyer employed by or on

---

**3.** The four additional elements are:

First, the party to be estopped must know the facts. Second, this party must intend that his [or her] conduct shall be acted upon, or must so act that the party asserting estoppel has a right to believe it is so intended. Third, the

party asserting estoppel must have been ignorant of the facts. Finally, the party asserting estoppel must reasonably rely on the other's conduct to his [or her] substantial injury. *Id.* at 238 (quoting *Portmann v. United States*, 674 F.2d 1155, 1167 (7th Cir.1982)).

behalf of the EPA has suggested to him or anyone else that has been involved in working on the Defendant's delisting petition that the review and consideration of said petition should be delayed or otherwise influenced by the lawsuit the United States has filed against the Defendant. (United States' Reply Exh. 4). Because the Court finds that the EPA has not engaged in affirmative misconduct, there is no reason to delve into the additional elements that the Defendant must prove to establish equitable estoppel.

*United States' Motion to Strike The Defendant's Citation of Supplemental, Dispositive Authority*

By this Motion, filed on October 19, 1992, the United States desires to strike the Defendant's citation of supplemental authority regarding the United States' Subtitle C claim. The United States claims that the Defendant's citation of supplemental authority is redundant and adds nothing supplemental to the excessive pages of argument the Defendant already made at summary judgment. This Court agrees.

After reviewing the case cited in the Defendant's memorandum, the Court finds that it is duplicative, and hereby GRANTS the United States' Motion to Strike the Defendant's Citation of Supplemental, Dispositive Authority.

*Defendant's Supplemental Cross–Motion for Partial Summary Judgment on Corrective Action Issues*

■ As to this Motion, this Court notes that the Defendant has violated this Court's orders of February 6 and February 12, 1992, setting a page limitation of 50 pages for motions for summary judgment. To this date, not even counting the instant motion, the Defendant has exceeded his page limitation by nine pages. Accordingly, this Court hereby *sua sponte* STRIKES the Defendant's Supplemental Cross–Motion for Partial Summary Judgment on Correction Action Issues. Where a party has violated the Court's procedural rules at the summary judgment stage, this Court is authorized to deny, on this basis alone, the offending party's summary judgment motion. *See Terre Haute Industries, Inc. v. Pawlik,* 765 F.Supp. 925, 928–29 (N.D.Ill.1991); *Property*

*Owners Ins. Co. v. Cope,* 772 F.Supp. 1096, 1098 (N.D.Ind.1991).

## CONCLUSION

For the reasons stated herein, the United States' Motions for Partial Summary Judgment and to Strike the Defendant's Citation of Supplemental, Dispositive Authority, are hereby GRANTED, the Defendant's Motions for Partial Summary Judgment are hereby **DENIED,** and the Court hereby **STRIKES** the Defendant's Supplemental Cross–Motion for Partial Summary Judgment on Corrective Action Issues. Civil penalties shall be determined by the Court at a later date.

In accordance with the findings of the Court, the Defendant is hereby **ORDERED:**

1. To comply with interim status requirements of RCRA for its terminal polishing lagoons and landfill, including the submittal of applicable permit applications, the preparation and submittal of a Closure Plan and a Post–Closure Plan, and the implementation of such approved plans; and

2. To comply with the SDWA and RCRA, including the corrective action requirements of the Defendant's underground injection well permits.

### *FINDINGS OF FACT*

Based on the above, pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court hereby finds as follows:

*United States' First Claim for Relief*

1. The Defendant is a Delaware corporation. (Exh. 1, Complaint ¶ 5; Answer ¶ 5). Among other facilities, the Defendant owns and operates the integrated steelmaking facility known as the Burns Harbor Plant (the "Facility") located in the town of Burns Harbor, Porter County, Indiana. (Exh. 1, Complaint ¶ 5; Answer ¶ 5)

2. The Defendant owns and operates two Class I underground injection wells at the Facility. (Exh. 1, Complaint ¶ 28; Answer ¶ 28). The Defendant started using these wells in 1968 and continues to use them to dispose of waste ammonia liquor generated at the Facility. (Exh. 1, Complaint ¶ 31;

Answer ¶ 31). The waste ammonia liquor disposed of in the injection wells is a characteristic hazardous waste within the meaning of Section 1004(5) of RCRA, 42 U.S.C. § 6903(5) and 40 C.F.R. § 261.32. (Exh. 2, Def.Response to U.S. Request for Admission, ¶ 7).

3. In accordance with the requirements of Section 1421 of SDWA, 42 U.S.C. § 300h, and 40 C.F.R. Part 144, on September 30, 1985, the EPA issued to the Defendant two UIC permits to operate the two underground injection wells. (Exh. 1, Complaint ¶ 29; Exh. Answer ¶ 29). These permits are designated as permit IN–127–1W–0003 and permit IN–127–1W–0004. (Exh. 1, Complaint ¶ 29; Answer ¶ 29). Each UIC permit authorizes the Defendant to dispose of waste ammonia liquor into the wells in accordance with each permit and the UIC program. *See* Parts I.A and I.E.1 of each UIC permit.

4. A SWMU is defined by the permits as:

Any contiguous land, structures, or other appurtenances, and improvements on the land used for storage, treatment disposal, collection, source separation, transfer, processing, resource recovery or conservation of any solid waste (as defined in 40 C.F.R. § 261.2). It includes any unit at the facility from which hazardous constituents migrate, irrespective of whether the units were intended for the management of solid and/or hazardous wastes.

*See* Exh. 3A and B at 55–56.

5. On November 15, 1985, the Defendant filed an administrative appeal of the UIC permits (Exh. 2, Def.Response to U.S.Req. for Admission, ¶ 1). On January 19, 1989, the EPA rejected the Defendant's appeal and the permits became final agency action. (Exh. 4, *In the Matter of Bethlehem Steel Corporation,* UIC Appeal Nos. 85–8 and 86–13; Exh. 2, Def.Response to U.S.Req. for Admission, ¶ 2). The Defendant then appealed the EPA's decision to the Seventh Circuit Court of Appeals (Exh. 2, Def.Response to U.S.Req. for Admission, ¶ 3).

6. The Seventh Circuit, which consolidated the Defendant's appeal with a similar appeal by Inland Steel Company, rejected the steel companies' claims and upheld the validity of the UIC permits, including the corrective action requirements. *Inland Steel Co. v. EPA,* 901 F.2d 1419 (7th Cir.1990). During the course of the appeal, Inland had asked the Court to stay the applicability of the permits pending judicial review, but the court denied the motion. (Exh. 5, *Inland Steel Co. v. EPA,* No. 89–1405 (7th Cir. August 15, 1989); Exh. 2, Def.Response to U.S.Req. for Admission, ¶ 4).

7. Since January 19, 1989, the Defendant has failed to perform the corrective action according to the terms of its UIC permits. (Exh. 6, Smith Decl. ¶ 3). The permits required the Defendant to submit to the EPA the preliminary assessment plan by February 27, 1989, and a corrective action plan by July 19, 1989. (*Id.*) These plans were not submitted by the required dates. (*Id.;* Exh. 2 Defendant's Response to U.S.Req. for Admission, ¶ 7.) The Defendant did not even commence making the preliminary assessment submission required by the UIC permits until July 16, 1990, and only recently submitted its final report on the assessment for the SWMUs it has identified to date. (Exh. 6, Smith Decl. ¶ 4).

8. On September 13, 1990, the EPA issued modified UIC permits to the Defendant. (Exh. 3, Hayworth Decl. ¶¶ 4 and 5). These permit modifications did not modify or supersede the corrective action requirements or schedule contained in the original UIC permits issued to the Defendant or change the original expiration date of these permits. (*Id.;* Exh. 7, Strom–Harvey Dep. at 39–48).

9. The Defendant then filed an administrative appeal of the modified permits. On June 11, 1991, that appeal was dismissed by the Administrator because the appeal was untimely. (Exh. 8).

10. The United States notified the State of Indiana about the commencement of this action. (Exh. 9, Zawodini Dep. at 8–9; Exh. 5, Muno Affidavit, United States' Reply).

*United States Second through Sixth Claims for Relief*

11. From the mid–1960's to June 16, 1983, the Defendant conducted chromium electroplating operations at the Facility. (Exh. 1, Complaint ¶ 41; Answer ¶ 41). Dur-

ing that time period, the Defendant treated the wastewater from those electroplating operations by, among other things, adding a flocculent or thickener. (*Id.*) One of the purposes of this flocculent or thickener was to promote the settling of solids that formed during the treatment of the wastewater. (Exh. 2, Boltz Dep. at 42–45).

12. The wastewaters, rinsewaters, and other solutions were then sent to the Burns Harbor Secondary Wastewater Treatment Plant for further treatment before discharge of the treated effluent through NPDES (National Pollutant Discharge Elimination System) permitted outfall 001. (*Id.*)

13. The Secondary Wastewater Treatment Plan or Facility at Burns Harbor includes the following units: scalping tanks, two (2) primary mixing tanks, six (6) secondary mixing tanks, seven flocculator clarifiers, a thickener, vacuum filters and two (2) terminal polishing lagoons. (Exh. 2, Boltz Dep. at 45–49, 60 and Exh. 2B (*See* Figure 1); Exh. 4, Dr. Bell Dep. at 8, 15–18, 52–53).

14. The Secondary Wastewater Treatment Plant is intended to remove oils and greases from the materials sent to it and to precipitate various metal or metallic bearing contaminants by adjustment of the pH the wastewater and by the addition of lime or flocculating materials to promote settling of solids. (Exh. 2, Boltz Dep. at 43–44). The Secondary Wastewater Treatment Plant is also intended to ensure Defendant's compliance with the discharge limitation contained in its NPDES permit. (*Id.*)

15. The Secondary Wastewater Treatment Plant receives wastewaters from the facility's ironmaking, steelmaking, hot forming and cold forming operations. (Exh. 3, Def.Response to United States' First Set of Interrogatories, No. 4, at 19–20). Until June 16, 1983, it received the wastewaters from the facility's chromium electroplating operations. (Exh. 1, Complaint ¶ 41; Answer, ¶ 41; Exh. 3, Def.Response to United States First Set of Interrogatories, No. 4, at 15–19).

16. The Secondary Wastewater Treatment process at the facility operates the same today as it did when the electroplating operations were being conducted. (Exh. 2, Boltz Dep. at 45).

17. Wastewaters from the various operations at the plant are sent through a pipe into the scalping tanks where pH is adjusted and a quiescent material is created for the separation from the wastewater of oil and grease. (*Id.* at 45–49). This material is accumulated and removed from wastewaters and handled separately within the plant and then those wastewaters go to the mixing tanks. (*Id.* at 46.)

18. To recognize the various solubilities of the metals in the wastewaters and to foster the optimum conditions for those metals to precipitate out, the pH is adjusted in mixing tanks by adding lime. (*Id.*) This is intended to ensure at the eventual discharge point, the Defendant can meet the NPDES discharge limitations. (*Id.*)

19. After the scalping tanks, the wastewaters go to a clarifier. (*Id.*). The clarifier is used to allow the precipitated materials to accumulate on the bottom as settled solids or a slurry. The wastewater then leaves the clarifier through a series of weirs at top of the unit and then enters a conduit. (*Id.* at 46–47).

20. The slurry resulting from clarifier then goes to a thickener (i.e. a big tank that allows slurry to increase its solids content). (*Id.* at 47). The products from the thickener are a thickened sludge and wastewater. (*Id.*) The sludge from the bottom of the thickener would then be disposed of at the facility's landfill. (*Id.*)

21. For a period of time from some time in 1965 until some time in June 1983, the sludge was first passed through vacuum filters to reduce the water content in the sludge and then it was landfilled, after 1980, in an uncovered 10 acre designated area of the facility, south of U.S. Route 12 and west of an abandoned portion of Samuelson road. (Exh. 3, Def.Response to United States' First Set of Interrogatories, No. 4, at 23–27; Exh. 2, Boltz Dep. at 47–48, 79–80).

22. The landfill was established in order to manage the volumes of the secondary treatment plant sludge that were generated at the facility. (Exh. 2, Boltz Dep. at 78).

23. After the thickener, the remaining wastewaters are then transported by underground pipe to the facility's two terminal polishing lagoons for additional treatment (i.e., further settling out of solids and the opportunity for the temperature or chemical composition of the wastewaters to equilibrate or become more uniform). (Exh. 2, Boltz Dep. at 53–54, .56, 60; Exh. 4, Dr. Bell Dep. at 8, 15–18, 52–53; Exh. 5, Sapia Dep. at 78).

24. Leading up to the two terminal polishing lagoons is an influent channel which conveys the wastewater from the underground pipe to the head end of the lagoons. (Exh. 2, Boltz Dep. at 56).

25. The facility's two terminal polishing lagoons were constructed in the early 1960's when the Burns Harbor plant was built. (Id. at 55). Since that time, the configuration of the lagoons has not changed. (Id.)

26. Each of the lagoons, which are excavated from native soil, is lined with a permeable slag liner. (Id. at 56–58). Due to the fact that the slag liner is not impermeable, some of the wastewater seeps into the subsurface of the lagoons. (Id. at 58–59).

27. The north lagoon is about 17.4 acres in size and the south lagoon is about 16 acres in size. The capacity of each lagoon is approximately 35 million gallons. (Id. at 69–70).

28. After receiving final treatment in the terminal polishing lagoons, the plant wastewater is discharged through NPDES monitoring station 011 to NPDES outfall 001 and then into the Little Calumet River. (Exh. 5, Sapia Dep. at 78; Exh. 2B (See Figure 1); Exh. 2, Boltz Dep. at 60).

29. The facility was in existence as a treatment, storage or disposal facility of hazardous wastes on or before November 19, 1980. (Exh. 2, Boltz Dep. at 83–87; Exh. 7, Def.Resp. to U.S.Adm. ¶ 8).

30. The Defendant ceased generating F006 hazardous waste when the electroplating operations at its facility were discontinued in June 1983. (Exh. 6 Def. Comments on Proposed Denial of Delisting Petition No. 0187, January 17, 1991 (revised April 29, 1991) at 51).

31. On or about July 14, 1981, the Defendant petitioned the EPA to delist the wastewater treatment sludge from its electroplating operations at its facility from the EPA hazardous waste classifications F006 and K062. (Exh. 1, Complaint, ¶ 48, Answer ¶ 48; Exh. 7, Def.Resp. to U.S.Req. for Adm. ¶ 17; Exh. 2, Boltz Dep. at 117–129 and Exh. 2B attached thereto).

32. Through its delisting petition, the Defendant sought to exclude two solid wastes, identified as Secondary Wastewater Treatment Plant ("SWTP") Filter Cake ("sludge") and Terminal Polishing Lagoon Dredgings, from the EPA hazardous waste classification numbers F006 and K062 that were generated and disposed of at its Burns Harbor facility. (Exh. 1, Complaint ¶ 48, Answer ¶ 48; Exh. 2, Boltz Dep. at 117 and Exh. 2B, at 2).

33. The Defendant admits in its delisting petition that the above wastes were generated as a result of the treatment (including lime neutralization/precipitation) of plant process wastewater at the plant's centralized Secondary Wastewater Treatment Plant. (Exh. 1, Complaint, ¶ 48; Answer, ¶ 48; Exh. 2, Boltz Dep. at 117 and Exh. 2B, at 4).

34. During the years of 1979 and 1980, the approximate generation rates of SWTP sludge at the facility were 47,000 and 38,000 tons per year, respectively. (Exh. 2B at 4).

35. Up to 10,000 tons per year of terminal polishing lagoon dredgings ("TPL dredgings") were generated during intermittent maintenance of the plant's terminal polishing lagoons. (Id.)

36. Due to the source of the TPL dredging (i.e., suspended solids settling in the terminal polishing lagoons dredgings), those dredgings were of a similar qualitative composition to the filter cake sludge. (Id.)

37. The SWTP Filter Cake and TPL dredgings that were the subject of the Defendant's delisting petition were disposed of in an off-site landfill that the Defendant owned and operated. (Id.)

38. The hazardous constituents present in the Defendant's wastewater treatment sludges from its electroplating operations (F006 hazardous waste) were hexavalent chromium, lead, cadmium, and nickel. (Id. at 7–8; Exh.

2, Boltz Dep. at 131–32; Exh. 8, 47 Fed.Reg. at 52670).

39. On November 22, 1982, the EPA granted the Defendant's July 14, 1981, delisting petition thereby temporarily excluding the solid wastes generated at the Defendant's facility from the list of hazardous wastes contained in 40 C.F.R. §§ 261.31 and 261.32 (Exh. 2, Boltz Dep. at 131–32; Exh. 8, 47 Fed.Reg. 52668–70).

40. At the time the temporary exclusion was granted to the Defendant, the EPA had not verified the test data submitted by the Defendant. (Exh. 2, Boltz Dep. at 131–32; Exh. 8, 47 Fed.Reg. 52668). At that time, however, the agency noted that it was initiating a spot sampling and analysis program to verify the representative nature of the data before final petitions would be granted. (*Id.*)

41. On January 17, 1986, the EPA proposed to deny the Defendant's petition because the petition was incomplete. (Exh. 2, Boltz Dep. at 131–32; Exh. 9, 51 Fed.Reg. 2526).

42. On July 23, 1986, the EPA proposed that the Defendant's July 14, 1981, delisting petition be denied and that the temporary exclusion previously granted to the Defendant be withdrawn. (Exh. 2, Boltz Dep. at 131–32; Exh. 10, 51 Fed.Reg. 26417, 26419–21).

43. In its proposed denial of the petition and withdrawal of the temporary exclusion, the EPA stated that it believed that the wastes generated at the Defendant's facility that were the subject of the delisting petition were not rendered nonhazardous by the treatment system at the facility. (Exh. 2, Boltz Dep. at 131–32; Exh. 10, 51 Fed.Reg. at 26421).

44. The EPA's evaluation of the sludges that were the subject of the Defendant's petition, through the agency's use of a vertical and horizontal spread ("VHS") model, indicated the potential of the SWTP filter cake and TPL dredgings to leach several toxic metals and contaminate ground water at levels of regulatory concern. (*Id.*)

45. The EPA's proposed denial of the Defendant's petition and withdrawal of the Defendant's temporary exclusion was based upon the presence in the subject wastes, of significant concentrations of various inorganics, including cadmium, chromium, lead, and selenium, and an organic contaminant, benzo(a)anthracene. (*Id.*)

46. Until August 22, 1986, the EPA's proposed denial of the Defendant's petition and withdrawal of Defendant's temporary exclusion was subject to public comment. (Exh. 2, Boltz Dep. at 131–32; Exh. 10, 51 Fed.Reg. 26417).

47. On November 7, 1986, the EPA denied the Defendant's delisting petition due to the fact that the Defendant had not demonstrated to the EPA that the wastes that were the subject to the Defendant's petition were rendered nonhazardous by the Defendant's treatment system. (Exh. 2, Boltz Dep. at 131–32; Exh. 11, 51 Fed.Reg. 41620, 41622). At that time, the EPA also revoked the Defendant's temporary exclusion. (*Id.*) This denial was published in the Federal Register on November 18, 1986. (*Id.*)

48. The EPA's denial of the Defendant's delisting petition was effective May 18, 1987. (*Id.*)

49. The EPA notified the Defendant that the effect of the agency's November 7, 1986, action was that Defendant had to manage the wastes that were the subject of its petition as hazardous waste in accordance with 40 C.F.R. Parts 262–266 and Parts 70, 271, and 124. (*Id.*)

50. Just prior to the EPA publishing its action on November 18, 1986, by letter dated November 6, 1986, to the EPA, the Defendant withdrew that portion of its delisting petition concerning TPL dredgings. (Exh. 2, Boltz Dep. at 136–77).

51. Prior to this letter, Defendant knew as early as mid-January 1986, that the EPA was planning to deny the Defendant's delisting petition and revoke its temporary exclusion. (*Id.;* Exh. 11, 51 Fed.Reg. 41622 at n. 5).

52. On February 12, 1987, the Defendant filed a petition for review of the EPA's November 18, 1986, rulemaking with the United States Court of Appeals for the District of Columbia Circuit. (Exh. 2, Boltz Dep. at

131–32; Exh. 12, 53 Fed.Reg. 38291; Exh. 14).

53. On March 18, 1988, the Defendant moved to remand to the Agency the EPA's denial of Defendant's petition in light of the decision in *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317 (D.C.Cir.1988). (*Id.*)

54. On July 29, 1988, the United States Court of Appeals granted the Defendant's motion to remand but denied its motion to vacate. (*Id.;* Exh. 14).

55. On September 30, 1988, the EPA withdrew its denial of the Defendant's petition. (Exh. 2, Boltz Dep. at 131–32; Exh. 12, 53 Fed.Reg. 38291). The EPA informed the Defendant at that time, however, that the Defendant had to continue to treat its F006 waste as hazardous waste until such time as they may, in the future, be granted an exclusion by the agency of that waste. (*Id.*)

56. On September 19, 1990, the EPA again proposed that the Defendant's delisting petition be denied. (Exh. 2, Boltz Dep. at 131–32; Exh. 13, 55 Fed.Reg. 38565).

57. The Defendant does not have a written closure or post-closure plan for the lagoons or landfill in accordance with the requirements of RCRA. (Exh. 2, Boltz Dep. at 194).

58. The Defendant has not implemented a closure or post-closure plan for the lagoons or landfill in accordance with the requirements of RCRA. (*Id.* at 194).

59. The Defendant has not met closure or post-closure performance standards for the lagoons or landfill in accordance with the requirements of RCRA. (*Id.*)

60. The Defendant has not complied with the groundwater monitoring requirements of RCRA for the terminal polishing lagoons or landfill. (*Id.* at 176–77).

61. The Defendant's existing groundwater monitoring system can not detect statistically significant amounts of hazardous waste or hazardous constituents that migrate from the waste management area to the upper-most aquifer. (Exh. 16, Dr. Fetter Dep. at 69–70).

62. The Defendant failed to comply with the annual groundwater reporting require-

ments of 40 C.F.R. § 265.94(a)(2); 329 I.A.C. 3–20–5. (*Id.* at 180).

63. Since May 18, 1987, the Defendant had not demonstrated financial assurance for closure care of the landfills and the lagoons. (*Id.* at 184).

64. The Defendant does not have a detailed written estimate in current dollars of the cost for closing either the lagoons or the landfill. (*Id.*)

65. Since May 18, 1987, the Defendant has not established to IDEM financial assurance for closure of the lagoons or the landfill. (*Id.*)

66. Defendant has not submitted to IDEM a closure trust fund or a surety bond guaranteeing payment into a trust fund or surety bond guaranteeing performance of closure or irrevocable standby closure letter of credit for the lagoons or the landfill. (*Id.* at 184–186).

67. Defendant has not submitted to IDEM a closure insurance certificate for the lagoons or landfill. (*Id.* at 186).

68. Since May 18, 1987, the Defendant has not submitted to IDEM any demonstration that Defendant passed a financial test for the lagoons or the landfills, including a letter by a chief financial officer with a financial statement, a statement by an independent public accountant of the examination of Defendant's financial statement, or any report by a certified public accountant, or statement or certificate that Defendant was suing a multiple form of financial instrument for financial assurance for closure. (*Id.* at 186–187).

69. Since May 18, 1987, the Defendant never had a detailed written estimate in current dollars of the annual cost of post-closure monitoring and maintenance of the lagoons and the landfill. (*Id.* at 187–88).

70. Since May 18, 1987, the Defendant has not submitted any financial assurance for post-closure care for the lagoons and landfill at the Burns Harbor facility, including a post-closure trust fund, surety bond guaranteeing performance of post-closure or payment into a trust fund, or post-closure letter of credit. (*Id.* at 188–189).

---

**1042**

71. Defendant has not submitted post-closure insurance for the lagoons and landfill or a letter signed by its chief financial officer for post-closure insurance, or certified to IDEM that Defendant intended to use a multiple financial mechanism for the post-closure insurance. (*Id.* at 188–190).

72. Since May 18, 1987, the Defendant has not submitted to IDEM for the lagoons and landfills any form of demonstration of compliance with the RCRA financial responsibility requirements for bodily injury and property damage to third parties including a certificate of liability insurance as required under RCRA. (*Id.* at 190–191).

73. Defendant has not installed a run-on control system, run-off management system, or wind dispersal management system in accordance with the requirements of RCRA. (*Id.* at 195–96).

74. By letters dated January 21, 1987 and March 1, 1988, IDEM formally requested the Defendant to submit part B of its RCRA permit application pursuant to 40 C.F.R. Section 270.10 and 329 IAC 3–34–1 (Exh. 1, Complaint, ¶ 78; Answer, ¶ 78).

75. Defendant has not submitted part B of its RCRA permit application. (Exh. 1, Complaint, ¶ 79; Answer, ¶ 79).

### *CONCLUSIONS OF LAW*

Based upon the above findings, the Court concludes as follows:

*United States' First Claim for Relief.*

1. This Court has jurisdiction over the subject matter of this action pursuant to Sections 3008(a) of RCRA, 42 U.S.C. § 6928(a), Section 1423 of the SDWA, 42 U.S.C. § 300h–2 and 28 U.S.C. §§ 1331, 1345, and 1355.

2. Venue is proper in this judicial district because the Facility owned and operated by the Defendant at which the violations this Court finds occurred is within this judicial district.

3. The Defendant is a person within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15), and within the meaning of Section 1401(12) of SDWA, 42 U.S.C. § 300f(12).

4. Pursuant to Section 1422(c), 42 U.S.C. § 300h–1(c) and 40 C.F.R. § 147.751, the UIC program for Class I wells for the State of Indiana is administered by the EPA. The UIC program for Class I Wells for the State of Indiana consists of the UIC program requirements of 40 C.F.R. Parts 124, 144 and 146, and 40 C.F.R. § 147.751.

5. Title 40 C.F.R. § 144.11 prohibits any underground injection except as authorized by permit or rule issued under the applicable UIC program.

6. Pursuant to 40 C.F.R. § 144.51(a), the owner or operator of a permitted injection well must comply with all conditions of a UIC permit, and each failure to comply with such conditions constitutes a violation of the applicable underground injection control program and the SDWA.

7. The United States has concurrent authority to enforce those portions of the RCRA hazardous waste management program that the EPA has authorized a state to enforce. In Indiana, the United States retains exclusive authority to enforce those portions of the RCRA hazardous waste management program added by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), including the "corrective action" provisions asserted herein under the First Claim for Relief. *See* Section 3006 of RCRA, 42 U.S.C. § 6926.

8. Pursuant to 40 C.F.R. § 270.60(b), the owner or operator of an injection well disposing of hazardous waste and having a UIC permit issued after November 8, 1984, shall be deemed to have a RCRA permit if the owner or operator complies with the conditions of that permit and the requirements of 40 C.F.R. § 144.14, and complies with requirements of 40 C.F.R. § 264.101.

9. Pursuant to 40 C.F.R. § 264.101, the owner or operator of a facility seeking a permit for the treatment, storage or disposal of hazardous waste must institute corrective action as necessary to protect human health and the environment for all releases of hazardous waste or constituents from any solid waste management unit at the facility, regardless of the time at which waste was placed in such unit.

10. Section 3004(u) of RCRA, 42 U.S.C. 6924(u), requires that a permit issued after November 8, 1984, by the EPA, or an authorized state, shall require corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage, or disposal facility seeking a RCRA permit, regardless of the time at which waste was placed in each unit.

11. Pursuant to Section 3004(v) of RCRA, 42 U.S.C. § 6924(v), and 40 C.F.R. § 264.-101(c), corrective action required at facilities for the treatment, storage, or disposal of hazardous waste includes corrective action beyond the facility boundary where necessary to protect human health and the environment.

12. At all times relevant to this action, each of the Defendant's underground injection wells was an "existing injection well" as defined at 40 C.F.R. § 144.3, and was subject to the requirements of Part C of the SDWA, 42 U.S.C. 300h, and its implementing regulations.

13. Waste ammonia liquor is a hazardous waste within the meaning of Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), and 40 C.F.R. § 261.32.

14. Each of the Defendant's underground injection wells is a "solid waste management facility or unit" and a "hazardous waste management unit" within the meaning of Section 1004(7), (28) and (29), 42 U.S.C. § 6903(7), (28) and (29).

15. Pursuant to 40 C.F.R. §§ 270.-1(c)(1)(i) and 270.60(b), the Defendant's two underground injection wells are subject to regulation under RCRA.

16. Section J of Part I of each of the Defendant's underground injection permits requires the Defendant to institute corrective action for the Burns Harbor facility necessary to protect human health and the environment for all releases of hazardous waste or hazardous constituents from any solid waste management unit, regardless of the time at which waste was placed in the unit, regardless of the time at which waste was placed in the unit. Attachment F to Part III of each of the Defendant's underground injection permits sets forth the requirements

of such corrective action and the schedule for meeting such requirements.

17. The corrective action requirement set forth in Attachment F to Part III of each permit, required the Defendant to perform the following: (1) submit to the EPA a preliminary assessment identifying the solid waste management units and the existence and, based on available information, the extent of the release of hazardous waste and hazardous constituents; (2) submit to the EPA a corrective action plan to remediate any releases of hazardous wastes or constituents; and (3) implement the corrective action plan.

18. The effective issuance date for the corrective action requirements of each of the Defendant's underground injection well permits is January 19, 1989.

19. The Defendant has failed to perform the corrective action as required by each of its underground injection well permits. Specifically, the Defendant has failed to submit to the EPA the preliminary assessment and corrective action plan as required by each permit, and has failed to commence implementation of any corrective action plan pursuant to the permits.

20. There is no genuine issue of material fact that the Defendant has failed to perform the corrective action as required by each of its underground injection well permits.

21. Pursuant to Section 1423 of the SDWA, 42 U.S.C. § 300h–2, the Defendant's failure to comply with the corrective action requirement of its underground injection well permits is a violation of the SDWA.

22. Pursuant to Section 3005 of RCRA, 42 U.S.C. § 9625, and 40 C.F.R. §§ 270.-1(b)(1) and 270.60(b), the Defendant's failure to comply with the corrective action requirements of its underground injection well permits is a violation of RCRA.

23. Pursuant to Section 1423(a) and (b) of the SDWA, 42 U.S.C. §§ 300h–2(a) and (b), the Defendant is liable for injunctive relief and civil penalties not to exceed $25,000 per day of violation for each violation of the SDWA and its underground injection well permits.

24. Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. § 6928(a) and (g), the Defendant is liable for injunctive relief and civil penalties not to exceed $25,000 per day of violation for each violation of RCRA.

*United States' Second through Sixth Claims for Relief*

25. This Court has jurisdiction over the subject matter of this action pursuant to Sections 3008(a) of RCRA, 42 U.S.C. § 6928(a) and 28 U.S.C. §§ 1331, 1345, and 1355.

26. Venue is proper in this judicial district because the Burns Harbor facility owned and operated by the Defendant at which the violations this Court finds occurred is within this judicial district.

27. Notice of the commencement of this case was provided to the State of Indiana pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2).

28. The Defendant is a person within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6903(15), and within the meaning of Section 1401(12) of SDWA, 42 U.S.C. § 300f(12).

29. The Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), 42 U.S.C. § 6901, *et seq.*, establishes a comprehensive regulatory program applicable to the generation, transportation, storage, treatment, and disposal of hazardous waste. Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), authorized the Administrator to promulgate regulations requiring owners or operators of hazardous waste treatment, storage or disposal facilities to obtain a RCRA operating permit. These regulations are codified at 40 C.F.R. Parts 260–271.

30. Under RCRA and its implementing regulations, a waste is determined to be hazardous if it exhibits certain characteristics, such as ignitability, corrosivity or EP toxicity (i.e., a characteristic hazardous waste), or if the waste is listed in the regulations as hazardous because it is from a specific or non-specific source that has been determined to be hazardous in nature (i.e., a listed hazardous waste). 40 C.F.R. §§ 261.20 and 261.30.

31. Pursuant to 40 C.F.R. § 260.22, any person may petition the EPA to exclude a waste generated at a particular facility from the list of hazardous wastes promulgated at Subpart D of 40 C.F.R. § 261 (i.e., to delist a waste). The delisting procedures are established by RCRA and implementing regulations. *See* Section 3001(f) of RCRA, 42 U.S.C. § 6921(f), and 40 C.F.R. §§ 260.20, 260.22.

32. RCRA and its implementing regulations provide for government regulation of hazardous waste management facilities primarily through a permitting process. Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), generally prohibits the operation of hazardous waste management facilities or "units" except in accordance with RCRA permit.

33. Section 3005(e)(1) through (3) of RCRA, 42 U.S.C. § 6925(e)(1) through (3), provides that an owner or operator of a facility in existence on November 19, 1980, that has not yet received a permit, may obtain "interim status" to continue operating its existing hazardous waste management units until final action is taken by the EPA or by an authorized State, with respect to its permit application, so long as the owner or operator of the facility satisfies certain conditions specified in Sections 3005 and 3010 of RCRA. Those conditions include filing a timely notice with the EPA that the facility is treating, storing, or disposing of hazardous waste, and filing a timely application for hazardous waste permit. Facilities that fulfill all specified statutory conditions may be authorized to continue operation on an "interim status" basis until final action is taken on their permit application.

34. Section 3004 of RCRA, 42 U.S.C. § 6924, authorized the Administrator of the EPA to promulgate regulations establishing performance standards necessary to protect human health and the environment, applicable to owners and operators of interim status hazardous waste management, treatment or disposal facilities. These regulations are codified at 40 C.F.R. Part 265.

35. Section 3006 of RCRA, 42 U.S.C. § 6926, provides that a state may be authorized to administer and enforce the RCRA hazardous waste management program. The

State of Indiana received Phase I interim authorization from the EPA on August 18, 1982, and Phase II final authorization on January 31, 1986, to administer a RCRA waste management program. Indiana has since promulgated regulations applicable to hazardous waste management facilities in Indiana. *See* 329 Indiana Administrative Code 3 Rule 40–54 and 15–22.

36. The State program includes regulations covering permits, interim status, groundwater monitoring, financial responsibility, and closure and post-closure requirements, as set forth at 329 Indiana Administrative Code ("IAC") 3–40 to 3–54 and 3–15 to 3–22. These regulations, which are administered by the Indiana Department of Environmental Management ("IDEM"), are substantially equivalent to the federal regulations set forth at 30 C.F.R. Part 260 *et seq.* Citations herein to applicable regulations cite the federal regulations and the comparable state regulations. The federal regulations were applicable to Defendant prior to August 18, 1982, and the state regulations have been applicable to Defendant since August 18, 1982.

37. The United States has concurrent authority to enforce those portions of the RCRA hazardous waste management program that the EPA has authorized a state to enforce. The United States retains exclusive authority to enforce those portions of the RCRA hazardous waste management program added by the Hazardous and Solid Waste Amendments of 1984 ("HSWA").

38. The Burns Harbor facility generates, or has generated, various hazardous wastes within the meaning of RCRA and its implementing regulations. *See* 40 C.F.R. Part 261. The hazardous wastes generated at times relevant to this action at the facility include, among others, waste ammonia liquor and wastewater treatment sludges from electroplating operations. *See* 40 C.F.R. §§ 261.31 and 261.32.

39. The Burns Harbor facility was in existence as a facility for the treatment, storage, or disposal of hazardous waste on or before November 19, 1980 within the meaning of Section 3005(e) of RCRA, 42 U.S.C. § 6925(e).

40. In the course of operating the Burns Harbor facility, the Defendant treated, stored or disposed of "hazardous wastes" within the meaning of Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), and 40 C.F.R. § 261.3.

41. Pursuant to Section 3005(e)(1) of RCRA, 42 U.S.C. § 6925(e)(1), Defendant sought authority to operate a hazardous waste management facility at the Indiana Harbor works in 1980 by notifying the EPA that it treated, stored or disposed of hazardous wastes at the Indiana Harbor Works and by submitting Part A of the RCRA permit application.

42. Due to Defendant's notification to the EPA and its submission of a Part A permit application, the Burns Harbor facility was authorized under Section 3005(e)(1) of RCRA, 42 U.S.C. § 6925(e)(1), to operate as a hazardous waste management facility on an interim status basis.

43. From the mid–1960's to June 16, 1983, Defendant conducted electroplating operations at the Burns Harbor facility. Defendant treated the wastewater from the electroplating operations at its facility by, *inter alia*, adding a flocculent or thickener and providing opportunity for the resulting solids to settle out. This treatment generated a sludge which is a "hazardous waste" listed at 40 C.F.R. § 261.31, and is assigned the EPA hazardous waste number F006.

44. Defendant disposed of F006 waste in a "landfill" within the meaning of 40 C.F.R. § 260.10, located at the Burns Harbor facility.

45. Defendant stored or disposed of F006 waste in two "surface impoundments" within the meaning of 40 C.F.R. § 260.10, known as the terminal polishing lagoons, located at the Burns Harbor facility.

46. The landfill and terminal polishing lagoons are each a "hazardous waste management unit" or facility, within the meaning of Section 1004(7) of RCRA, 42 U.S.C. § 6903(7) and 40 C.F.R. § 260.10, subject to the permit requirements and performance standards for interim status facilities.

1046

47. The presence of hazardous waste in the landfill at the Burns Harbor facility constitutes "disposal" within them meaning of Section 1004(3) of RCRA, 42 U.S.C. § 6903(3).

48. The presence of hazardous waste in the terminal polishing lagoons at the Burns Harbor facility constitutes "storage" or "disposal" within the meaning of Section 1004(3) and (33) of RCRA, 42 U.S.C. § 6903(3) and (33).

49. On July 20, 1981, Defendant petitioned the EPA to delist the F006 waste generated at the Burns Harbor facility. On November 22, 1982, the EPA temporarily granted Defendant's petition by granting the Defendant a "temporary exclusion." The temporary exclusion expired on November 8, 1986. *See McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1324 (D.C.Cir.1988).

50. The closure and post-closure requirements of 40 C.F.R. § 265, Subpart G, provide that the owner or operator of a hazardous waste management unit must comply with all applicable closure and post-closure requirements, including submitting a Closure Plan, implementing the approved Closure Plan, submitting a Post–Closure Care Plan, implementing the approved Closure Plan and complying with closure performance standards. 40 C.F.R. §§ 265.110–120; 329 IAC 3–21–1 to 3–21–11.

51. On and after May 18, 1987, Defendant failed to comply with the closure and post-closure requirements for the terminal polishing lagoons and the landfill in violation of 40 C.F.R. §§ 265.110–120 and 329 IAC 3–21–1 to 3–21–11.

52. The groundwater monitoring requirements of 40 C.F.R. § 265, Subpart F, provide that the owner or operator of hazardous waste management facilities must implement a system of groundwater monitoring capable of determining the facility's impact on the groundwater in the uppermost aquifer underlying the facility and detecting significant amounts of hazardous waste or hazardous constituents that migrate from the waste management area to the upper most aquifer. The groundwater monitoring requirements also require the facility to provide an annual

monitoring report containing the results of the groundwater quality assessment program including the rate of migration of hazardous waste or hazardous constituents. 40 C.F.R. §§ 265.90–94; 329 IAC 3–20–1 to 3–20–5.

53. On and after May 18, 1987, the Defendant failed to implement a system of groundwater monitoring for the terminal polishing lagoons and the landfill in violation of 40 C.F.R. §§ 265.90–94 and 329 IAC 3–20–1 to 3–20–5.

54. The financial responsibility requirements of 40 C.F.R. Part 265, Subpart H, provide that the owner or operator of hazardous waste management facilities must establish financial assurance for the closure and post-closure care of each of its units. 40 C.F.R. §§ 265.143 and 265.145; 329 IAC 3–22–4 and 3–22–14. The assurance requirement may be satisfied by: (1) establishing a trust to be funded by annual payments based upon the estimated cost of closure and post-closure care and the anticipated date of closure; (2) by obtaining a surety bond, letter of credit, closure insurance, or a combination of all mechanisms; or (3) by passing a financial test or by obtaining a corporate guarantee for closure and post-closure care from a company that passes the financial test. 40 C.F.R. §§ 265.143(a)–(e) and 265.145(a)–(f); 329 IAC 3–22–5 to 3–22–9 and 329 IAC 3–22–13(a)–(f).

55. The financial responsibility requirements of 40 C.F.R. § 265, Subpart H, also provide that the owner or operator of hazardous waste management facilities must demonstrate financial responsibility for bodily injury and property damage to third parties caused by sudden and non-sudden accidental occurrences arising from the operation of its facilities. 40 C.F.R. §§ 265.147(a) and (b) and 329 IAC 3–22–24(a) and (b). This insurance requirement may be satisfied in one of three ways: (1) by obtaining specified amounts of sudden and non-sudden liability insurance; (2) by passing a financial test or by obtaining a corporate guarantee for liability coverage from a company that passes the financial test; or (3) by a combination of either the financial test and insurance or the corporate guarantee and insurance. 40

C.F.R. §§ 265.147(a)(1)(3) and (b)(1)(3); 329 IAC 3–22–24(a)(1)(B) and (b)(1)(B).

56. On or after May 18, 1987, the Defendant failed to establish financial assurance for the closure and post-closure care on the terminal polishing lagoons and the landfill in violation of 40 C.F.R. § 265.147 and 329 IAC 3–22–13.

57. On or after May 18, 1987, Defendant failed to demonstrate financial responsibility for bodily injury and property damage to third parties caused by sudden and non-sudden accidental occurrences arising from the operation on the terminal polishing lagoons and the landfill in violation of 40 C.F.R. 265.147 and 329 IAC 3–22–24.

58. The performance requirements applicable to landfills set forth at 40 C.F.R. § 265, Subpart N, provide that the owner or operator of a facility that disposes of hazardous waste in the landfill must, *inter alia,* design, construct, operate, and maintain a run-on control system capable of preventing flow onto the active portion of the landfill during peak discharges from at least a 25–year storm; design, construct, operate and maintain a run-off management system to collect and control at least the water volume resulting from a 24–hour, 25 year storm; and cover or otherwise manage the landfill so that wind dispersal of hazardous waste subject to such dispersal is controlled. 40 C.F.R. §§ 265.302(a), (b), and (d); 329 IAC 3–28–3(a), (b), and (d).

59. On and after May 18, 1987, Defendant failed to provide a run-on control system for its landfill in violation of 40 C.F.R. § 302(a), 329 IAC 3–28–3(a); failed to provide a run-off management system in violation of 40 C.F.R. § 302(b), 329 IAC 3–28–3(b); and failed to cover or otherwise manage its landfill to control wind dispersal of hazardous waste in violation of 40 C.F.R. § 302(d), 329 IAC 3–28–3(d).

60. Title 40 C.F.R. § 270.10 provides that a state which has received Phase II final authorization to administer a RCRA waste management program, may require an existing hazardous waste management facility to submit part B of its RCRA permit application.

61. The State of Indiana received Phase II authorization on January 31, 1986.

62. By letters dated January 21, 1987 and March 1, 1988, IDEM formally requested Defendant to submit Part B of its RCRA permit application.

63. Defendant failed to submit a Part B permit application as requested by IDEM pursuant to 40 C.F.R. § 270.10 and 329 IAC 3–34–1.

64. Pursuant to Section 3005(a) of RCRA, 42 U.S.C. § 6925(a) and 40 C.F.R. §§ 270.-1(b), 270.10 and 329 IAC 3–34–1, Defendant's failure to submit a Part B application as requested by IDEM is a violation of RCRA.

65. Pursuant to Section 3008(a) and (g) of RCRA, 42 U.S.C. 6928(a) and (g), the Defendant is liable under the United States' Second, Third, Fourth, Fifth, and Sixth claims for relief for injunctive relief and civil penalties not to exceed $25,000 per day of violation for each violation of RCRA. Unless enjoined by this Court, the Defendant's violations will continue.